UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLMERS RIVERA,                                                         REPORT
                                                                                            and
                                               Plaintiff,                      RECOMMENDATION

                       v.                                                    12-CV-00455S(F)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                                               Defendant.
_____

APPEARANCES:          MYERS QUINN & SCHWARTZ LLP
                                   Attorneys for Plaintiff
                                   LEWIS L. SCHWARTZ, of Counsel
                                   1231 Delaware Avenue
                                   Suite 103
                                   Buffalo, New York  14209

                                   WILLIAM J. HOCHUL, JR.
                                   UNITED STATES ATTORNEY
                                   Attorney for Defendant
                                   KEVIN D. ROBINSON
                                   Assistant United States Attorney, of Counsel
                                   Federal Centre
                                   138 Delaware Avenue
                                   Buffalo, New York  14202
                                          and
                                   STEPHEN P. CONTE
                                   Regional Chief Counsel, Region II, and
                                   DANIEL R. JANES, Assistant Regional Counsel
                                   Office of the General Counsel
                                   Social Security Administration

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and, pursuant to Fed.R.Civ.P. 25 (d)(1), is substituted for her predecessor, Michael J. Astrue, as the defendant in this action.  No further action is required to continue this suit.  42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

## JURISDICTION

This case was referred to the undersigned on May 9, 2013, for pretrial matters, including preparation of a report and recommendation on dispositive motions. The matter is presently before the court on motions for judgment on the pleadings filed on January 15, 2013, by Defendant (Doc. No. 9), and by Plaintiff (Doc. No. 11).

## BACKGROUND

Plaintiff Charlmers Rivera ("Plaintiff"), seeks review of Defendant's decision denying Social Security Disability Income ("SSDI" or "disability benefits") under Title II of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined that although Plaintiff has not engaged in substantial gainful activity since February 15, 2006, and suffers from the severe impairments of status post multiple brain trauma by history only with mild cognitive limitations, and drug and alcohol abuse in partial remission at times with some relapses, and the non-severe impairments of spondylosis of the lumbar spine, lumbar somatic dysfunction, radiculopathy of the left lower extremity, lumbago, and degenerative disc disease of the L5-S1, Plaintiff does not have an impairment or a combination of impairments within the Act's definition of impairment. (R. 18).[1] As such, Plaintiff was found not disabled, as defined in the Act, at any time through the date of the Administrative Law Judge's decision. (R. 30).

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on August 4, 2006, claiming a disability onset date of February 15, 2006. (R. 109-12, 137). The application initially was denied on January 26, 2009. (R. 69-72). Pursuant to Plaintiff's request, filed January 29, 2009 (R. 73-74), an administrative hearing was held in Buffalo, New York before Administrative Law Judge ("ALJ") Timothy M. McGuan ("ALJ McGuan" or "the ALJ") on July 28, 2010. (R. 35-67). Plaintiff, represented by Paul Pochepan, Esq. ("Pochepan"), appeared and testified at the hearing, (R. 27-60), and testimony was also given by Vocational Expert ("VE") Jay Steinbrenner ("VE Steinbrenner" or "the VE"). (R. 61-66). In his decision, dated August 20, 2010, the ALJ found Plaintiff was not disabled. (R. 30). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 17, 2012. (R. 1-6). This action followed on May 15, 2012.

Defendant's answer to the Complaint, filed on August 10, 2012, (Doc. No. 3), was accompanied by the manually filed record of administrative proceedings. On January 15, 2013, motions for judgment on the pleadings were filed by Defendant (Doc. No. 9) ("Defendant's motion"), accompanied by a Memorandum of Law (Doc. No. 10) ("Defendant's Memorandum"), and by Plaintiff (Doc. No. 11) ("Plaintiff's motion"), also accompanied by a Memorandum of Law (Doc. No. 12) ("Plaintiff's Memorandum"). On March 8, 2013, Defendant filed a response to Plaintiff's motion (Doc. No. 16) ("Defendant's Response"). On March 12, 2013, Plaintiff filed a response to Defendant's motion (Doc. No. 17) ("Plaintiff's Response"), and a reply in further support of Plaintiff's motion. (Doc. No. 18) ("Plaintiff's Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be GRANTED, and Plaintiff's motion should be DENIED.

## FACTS

Plaintiff Charlmers Rivera ("Plaintiff" or "Rivera"), born on August 21, 1968, was 41 years old as of the ALJ hearing. (R. 39, 109, 111, 113). Plaintiff graduated high school and attended college for two semesters, but completed only one. (R. 39). In 1987, Plaintiff commenced service in the army where he worked in supply services, until he was honorably discharged in 1992. (R. 142, 245, 741, 869). Plaintiff completed training at the firefighting academy in 1997, and then worked as a firefighter in Buffalo, New York, until February 15, 2006, when medical and psychological problems caused Plaintiff to stop working. (R. 39-40, 138, 144, 742, 869).

On July 8, 2007, computed tomography ("CT") scans of Plaintiff's chest were normal. (R. 195-97).[2] X-rays taken April 9, 2008 showed a spur with adjacent soft tissue calcifications on Plaintiff's right elbow (R. 192), and normal right hand. (R. 194). April 11, 2008 X-rays of Plaintiff's left leg and ankle showed "slight degenerative changes" to the talus (ankle) without degenerative joint disease, a healed fracture of the distal fibula with surgical plate and screw in place, and a small intra-articular loose body (bone or cartilage fragments located within joint cavity). (R. 193).

On May 19, 2008, Plaintiff, then homeless, was admitted by psychiatrist Dorota Cardy ("Dr. Cardy"), to the VA in Buffalo, New York. (R. 219-21). Plaintiff's admitting

---

[2] Because Plaintiff is a veteran of the United States Army, most of his medical records are from the Veteran's Administration Medical Center ("the VA"), in Buffalo, New York (R. 191-227), or in Batavia, New York. (R. 274-926). Accordingly, unless otherwise indicated, all medical reports, progress treatment notes, test results and laboratory reports are from the VA.

psychiatric diagnosis per the Diagnostic and Statistical Manual of Mental Disorders[3] included Axis I: psychotic disorder, not otherwise specified, by history, homelessness, post-traumatic stress disorder ("PTSD"), by history, and alcohol and cocaine dependence; Axis II: personality disorder, by history; Axis III: same as Axis I and II; Axis IV: moderate to severe recent psychosocial stressors; and Axis V: Global Assessment of Functioning ("GAF")[4] of 40. (R. 219-20). Plaintiff's course of treatment included working with an addiction therapist developing an individualized treatment plan. (R. 219-21). Plaintiff's psychological problems were assessed as "moderate to severe." (R. 220). Although Plaintiff was anticipated to spend 37 days in treatment and attended some classes, on June 22, 2008, Plaintiff left the grounds and, upon return, tested positive for alcohol. (R. 220). On June 24, 2008, Plaintiff was discharged from the treatment program for non-compliance. (R. 220). Upon discharge, Plaintiff was assessed as having variable mood and manipulative, but without suicidal ideation and able to contract for safety. (R. 220-21). GAF was 40 both upon admittance and discharge. (R. 220). Upon examination in follow-up by internist Chitra Venkatram ("Dr. Venkatram"), on September 30, 2008, Plaintiff reported being drug-free for eight months until consuming alcohol three days earlier. (R. 222-27). Physical examination was remarkable only for sore throat, right ear-ache, occasional shortness of breath, chronic

---

[3] The Diagnostic and Statistical Manual of Mental Disorders ("DSM") is the standard classification of mental disorders used by mental health professionals for patient diagnosis and treatment. It uses a "multiaxial" system for assessment, including (1) Axis I, representing acute symptoms needing treatment; (2) Axis II, assessing personality disorders and intellectual disabilities that are usually life-long problems arising during childhood; (3) Axis III for medical or neurological conditions that may influence a psychiatric problem; (4) Axis IV identifying recent psychosocial stressors; and (5) Axis V, identifying the patient's ability to function in daily life according to the Global Assessment of Functioning ("GAF") Scale. DSM IV, *available at* http://www.psyweb.com/DSM_IV/iv.jsp, *last visited* Sept. 23, 2013.
[4] A GAF Score of 40 indicates "[s]ome impairment in reality testing or communication . . . *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 34.

low back and left ankle pain, hypertension, and current tobacco smoker.  (R. 224, 226-27).  Plaintiff was assessed with polysubstance abuse, drug abuse, moderate LS herniated disc, old left ankle fracture, uncontrolled hypertension, hyperlipidemia (elevated blood lipids), obesity, and upper respiratory infection.  (R. 224, 226).  Plaintiff was advised to continue exercising, continue taking medications, lose weight, and abstain from smoking, drinking, and abusing drugs.  (R. 224, 226-27).

On August 18, 2008, Plaintiff filed his disability benefits application claiming he became disabled on February 15, 2006.  (R. 109-115).   On a Disability Report form completed in connection with his disability benefits application, Plaintiff attributes his disabling condition to herniated discs in his lumbar spine, depression, anxiety, left leg injury, left ankle injury, shoulder problem, numbness, and constant and severe pain in his lower back, left leg, and left ankle.  (R. 137).  According to Plaintiff, his leg sometimes "gives out" on him, when his legs were numb, he was unable to walk, and his physical infirmities and pain interfered with his ability to sleep and caused him to be depressed.  (R. 137).

On November 10 and 17, 2008, Plaintiff was treated by Michael Calabrese, M.D. ("Dr. Calabrese"), for back pain radiating to his lower extremities with periodic paresthesia (sensation of limbs falling asleep) below the knee and associated numbness in his toes.   (R. 232-33).  Examination revealed decreased back motion and reduced sensation, Plaintiff was diagnosed with lumbar disc herniation and radiculitis, and Lortab (pain), Motrin (pain) and Soma (muscle relaxer) were prescribed.  (R. 232-33).

On December 1, 2008, Plaintiff underwent MRIs of his lumbosacral spine and left ankle (R. 243), a consultative physical examination by Samuel Balderman, M.D. ("Dr. Balderman") (R. 239-43), and a consultative psychiatric evaluation by Thomas Ryan, Ph.D. ("Dr. Ryan") (R. 244-47). The MRI of Plaintiff's lumbosacral spine was normal, and of his left ankle showed old healed fracture with hardware in good position, mild osteoarthritis of the ankle joint, and dorsal osteophytes projecting from the tarsal bones. (R. 243). Straight leg-raising was negative bilaterally. (R. 241). Dr. Balderman diagnosed status post left ankle fracture, and lumbar spine pain. (R. 239-43). Plaintiff's prognosis was stable and Dr. Balderman assessed Plaintiff's left ankle pain posed "mild-to-moderate limitations" in prolonged walking, climbing, and running, and lumbar spine pain posed mild limitations in bending and lifting. (R. 241). Dr. Ryan's mental status evaluation of Plaintiff was remarkable for mildly impaired recent and remote memory skills, and somewhat poor insight and judgment. At that time, the only family Plaintiff saw was his grandmother with whom Plaintiff lived, and Plaintiff had no friends. (R. 246). Although Plaintiff demonstrated no significant limitations in following and understanding simple directions, performing simple tasks, maintaining attention, concentration, and a regular schedule, and learning new tasks, Dr. Ryan assessed Plaintiff as possibly having moderate to significant limitations performing complex tasks, making adequate decisions, relating with others, and dealing with stress. (R. 246). Dr. Ryan recommended Plaintiff continue with his current psychiatric and substance abuse treatment, prognosis was guarded, and questioned Plaintiff's ability to manage benefit payments until Plaintiff was completely substance-free for some time. (R. 247).

In January 2009, Physical Residual Functional Capacity ("RFC-Physical") and Mental Residual Functional Capacity ("RFC-Mental") assessments were completed by Disability Determination Services ("DDS") examiners, based on a review of Plaintiff's medical records and in connection with Plaintiff's disability benefits application.  In particular, on January 13, 2009, DDS examiner J. Devlin ("Devlin"), completed an RFC-Physical Assessment, assessing Plaintiff's back disorder and left ankle pain caused exertional limitations of lifting and carrying 50 pounds occasionally, and 25 pounds frequently, standing or walking 6 hours a day, sitting 6 hours a day, but ability to push and pull was unlimited.  (R. 248-49).  Plaintiff's physical impairments posed no postural, manipulative, visual, communicative, or environmental limitations, (R. 250-51), and Plaintiff's allegations of significant limitations were not supported by the medical evidence.  (R. 252).

On January 14, 2009, psychologist M. Totin ("Dr. Totin"), completed anRFC-Mental (R. 254-57), finding Plaintiff moderately limited in understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 254-55).  Plaintiff was otherwise not significantly limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (R. 254-55).  On a Psychiatric Review Technique completed on January 22, 2009, Dr. Totin assessed Plaintiff with an affective disorder, a depressive disorder, not otherwise specified, and behavioral or physical changes associated with the regular use of substances affecting the central nervous system.  (R.

260-69).  Functional limitations attributed to Plaintiff's psychological impairments included mild difficulties maintaining social functioning, concentration, persistence, and pace, but no restriction in activities of daily living.  (R. 270).  Dr. Totin noted Plaintiff's recent and remote memory are mildly impaired, insight and judgment are somewhat impaired, Plaintiff is able to follow and understand simple directions, can maintain a schedule and learn new tasks, but may have difficulty with complex tasks, relating to others, and stressful situations.  (R. 272).

X-rays of Plaintiff's lumbosacral spine taken January 28, 2009 showed spondylosis of the lower thoracic spine, and lumbar spine (mild), mild old compression of the T12, L1 vertebrae, and mild degenerative joint disease ("DJD") of right hip.  (R. 712-13; 795-96).

On March 3, 2009, the Department of Veterans Affairs ("VA"), assessed Plaintiff with a 10% service connected disability, effective May 15, 2008, based on his L5-S1 disc herniation with thoracolumbar spondylosis and old mild compression of T11-12 vertebrae.  (R. 658-60).  Plaintiff was further assessed with 30% service connected disabilities and 90% non-service connected disabilities, the most recent non-service connected disability for pension purposes being an anxiety disorder, not otherwise specified and evaluated at 70% disabling.  (R. 658, 661).

According to an October 7, 2009, Healthcare for Homeless Veteran ("HCHV") Progress Note prepared by social worker Lauren Fields ("Fields"), Plaintiff was then living with his grandmother, but having problems with his sister, who had a restraining order against him, and his niece, whom Plaintiff described as "a liar, and out of control." (R. 395, 409, 414-15).  Plaintiff reported his personal belongings had been vandalized,

for which he intended to file a police report, and that he was feuding with his relatives, whom he denied he would ever harm. (R. 414). Plaintiff was provided with emergency shelter information. (R. 415).

On November 6, 2009, Plaintiff underwent a Mental Health Diagnostic Study, the results of which suggested using a physician's clinical judgment to determine treatment based on Plaintiff's duration of symptoms and functional impairment, a strong likelihood of hazardous or harmful alcohol consumption, and a positive screening for PTSD. (R. 399-402). Plaintiff had a history of suicide attempt, but denied current suicidal or homicidal ideation, and his risk factors included traumatic brain injury ("TBI"), impulsivity/engaging in reckless behaviors, alcohol/substance abuse or dependency, relationship difficulties, civilian trauma exposure, unemployed/unstable employment, homeless/unstable housing, military sexual trauma, history of physical or sexual abuse, poor coping skills, and recent/pending significant loss: emotional, physical, housing, financial, employment, or other. (R. 402-03). Plaintiff was determined to be "low risk" but ongoing monitoring was warranted. (R. 403). Plaintiff was referred for inpatient substance abuse treatment. (R. 403-04).

On December 16, 2009, Plaintiff was admitted to inpatient treatment for alcohol abuse and detoxification, reporting he had been sober and had not used drugs for 1 ½ years, but had been drinking beer daily for the past two weeks, including just prior to entering treatment, and had smoked crack cocaine the previous day. (R. 394). Plaintiff reported he had been living with his grandmother, but had been asked to leave following an altercation with his sister, and had been "falsely" arrested that day for selling drugs. (R. 395). Upon mental status examination, Plaintiff was "fairly groomed," alert, and

oriented in all three spheres (person, place and time), appeared stated age, maintained fair eye contact, but reported feeling depressed, affect was expansive, speech was pressured, thoughts were linear, and insight and judgment were impaired. (R. 395). Physical examination revealed blood pressure of 149/76, heart rate of 113, and Plaintiff, who was noted as "morbidly obese," weighed 263 lbs. (R. 390). Examination of Plaintiff's spine showed no tenderness. (R. 390). It was noted Plaintiff "self-reports" a pain score of 8 on a scale of 1 to 10. (R. 392). Plaintiff was assessed with polysubstance abuse, adjustment disorder with depressed mood which was "probably secondary to being arrested today," obesity, hypertension, and dyslipidemia (elevated blood cholesterol and triglycerides), for which Plaintiff had been noncompliant with medications, and degenerative joint disease with history of left ankle fracture with pinning. (R. 390).

While Plaintiff was admitted to in-patient treatment, he met with psychiatrist Aimee Stanislawski, M.D. ("Dr. Stanislawski"), who noted Plaintiff had a history of polysubstance dependence and antisocial personality disorder, and complained of substance use including cocaine and alcohol, and depression, but did not meet the criteria for any other psychiatric disorder. (R. 354). On December 18, 2009, Plaintiff informed licensed practical nurse ("LPN") Suzanna M. Mancuso ("Nurse Mancuso"), that his pain was a 10 out of 10, that Tylenol was ineffective for pain, and requested Lortab, advising he could "go to the crack house and get some off the street" if necessary. (R. 332). Plaintiff was observed as "obese," "malodorous," and "poorly groomed," appearing older than his stated age, yet cooperative with his interview, with clear speech, albeit laced with expletives, rapid pace, maintained good eye contact, denied

suicidal or homicidal ideation, audio-visual hallucinations, or delusions, was alert, oriented in all three spheres, reported his mood as "all right," with restricted affect, no abnormal movements noted, and fair insight/judgment. (R. 340).

In a December 20, 2009, Nursing Note prepared by Lisa M. Nemmer ("Nurse Nemmer"), Plaintiff was reported as tending to his own activities of daily living, alert and oriented, with calm affect/mood, fair group participation, compliant with medication regime, selectively engaging and participating with recreation and socialization, was passively observant while with others, content to sit and watch television with minimal interaction, requested pain medication, preferably Lortab because Motrin was minimally effective, yet Plaintiff appeared to be "resting comfortably" and "ambulating easily" and without difficulty or facial grimacing, and smiling appropriately. (R. 314-15). Plaintiff's discharge plan was pending. (R. 315). On December 21, 2009, Plaintiff was discharged. (R. 312-13). Although Plaintiff had requested to be discharged to Little Portion Friary, no beds were available, so Plaintiff returned to his grandmother's home. (R. 302, 312-13).

On December 23, 2009, Plaintiff returned to HCHV seeking housing, explaining he was awaiting admission to the VA's Substance Abuse Residential Rehabilitation Treatment Program ("SARRTP"), for which there was a waiting list. (R. 301). Plaintiff also expressed interest in a Domiciliary Residential Rehabilitation Treatment Program ("DOM"), but the criminal matter pending against him had to be resolved prior to such placement. (R. 301). Plaintiff was oriented in all three spheres, his speech was somewhat pressured, but he showed no signs of lethality or psychotic symptoms. (R. 301). Upon examination, Plaintiff complained of low back pain, for which he requested

Lortab, but nurse practitioner Maura T. Folaron ("NP Folaron"), observed Plaintiff in no acute distress, he ambulated on his own without wincing, was alert and conversant, hip range of motion was full and painless, straight leg raising was normal, reflexes were active bilaterally, sensation was intact, and lumbar range of motion was restricted with pain only at the endpoints. (R. 296-99). During the examination, Plaintiff made three requests for Lortab, indicating if it was not prescribed, he would "go out on the street and get some heroin." (R. 299).

On January 14, 2010, Plaintiff met with Vocational Rehabilitation Specialist Thomas Sullivan ("Sullivan"), and expressed interest in work therapy, explaining his life had been complicated by issues related to his substance abuse. (R. 291). On a January 15, 2010, SARRTP evaluation report prepared by psychiatrist Alison P. Deem ("Dr. Deem"), Plaintiff was noted as feeling irritable, with high anxiety, reported having weekly nightmares, triggered by interpersonal conflicts, and daily auditory hallucinations that sometimes commanded him to act, but denied the hallucinations were a problem, and admitted to paranoia, felt the police were watching him, and was distrustful of others. (R. 287-90). Plaintiff was anxious, and not complying with his treatment and medications. (R. 287-90).

On January 20, 2010, Plaintiff was admitted to the SARRTP at VA Medical Center in Buffalo for cocaine and alcohol dependence where he attended daily substance abuse treatment programs. (R. 275-77, *see* R. 416-566 (treatment progress notes from Plaintiff's residential substance abuse program)). At Plaintiff's first group therapy session on January 20, 2010, Plaintiff was attentive and appeared interested in the material presented, his goal was to increase knowledge of his substance abuse

triggers and ways to cope with them, and Plaintiff's treatment plan included attending and participating in group therapy while a resident of the SARRTP.  (R. 277).

On January 22, 2010, Plaintiff was examined by NP Folaron for complaints of back pain.  (R. 559).  NP Folaron referred Plaintiff for a back brace, and on that same day he was fitted by orthotist Peter S. Heuser for a Lumbar Sacral Orthosis ("LSO"), a contoured straight back support for increased intra-abdominal support and low back pain.  (R. 558, 645-48).  At that time, Plaintiff's weight was 281.6 lbs.  (R. 562, 647).

On January 26, 2010, Plaintiff was evaluated for the incentive therapy program, with the short-term goal of developing and establishing worker/supervisor interpersonal skills, improving and increasing levels of responsibilities, independence, and developing leisure time activities, and long-term goals of providing avocational skill development.  (R. 554-58).  Plaintiff was to attend the program five times per week for three weeks.  (R. 554-55).

On January 29, 2010, Plaintiff underwent a physical medicine rehabilitation consultation for back pain.  (R. 640-42).  Plaintiff was assessed with chronic low back pain, compression fracture, poor posture, and decreased trunk stabilization, (R. 641), and physical therapy twice a week for four weeks was planned to improve trunk functionality range-of-motion, symptom relief, and self-management techniques including home exercises.  (R. 641).

On January 30, 2010, Plaintiff underwent a cognitive language evaluation at the VA's outpatient speech pathology clinic at the request of Dr. Deem, with the provisional diagnosis of head trauma attributed to Plaintiff's history of boxing and playing football.  (R. 630-34).  Upon examination, speech language pathologist Anthony J. Pozzuto ("SLP

Pozzuto"), assessed Plaintiff with mild impairment of comprehension, mild to moderate impairment of delayed memory recall, low-average sentence repetition and calculations, and average naming, constructional ability, reasoning topic similarities, and judgment. (R. 633). SLP Pozzuto's impression was Plaintiff presented with a mild-moderate deficit in delayed recall of information, mild deficit in auditory comprehension, and low-average ability in mental math calculations, and that Plaintiff's difficulties with memory, speech, intelligibility, and language comprehension were "obviously affecting his life in adverse manner." (R. 633-34). Plaintiff's trial use of a personal digital assistant ("PDA") was evaluated and a PDA was indicated to assist with his specific memory deficit. (R. 634). SLP Pozzuto's recommendation, with which Dr. Deem concurred, was speech therapy to improve attention and memory abilities one to two times per week, and a PDA, (R. 634), which Plaintiff was issued on February 6, 2010. (R. 529).

At his regularly scheduled physical therapy appointment on February 3, 2010, Plaintiff complained of "aching, stabbing" low back and ankle pain, estimated at 8 out of 10 prior to therapy, and 7 out of 10 after therapy. (R. 535). Plaintiff requested and was issued a cane to relieve ankle pain and low back pain while walking. (R. 536, 621-29). The request was approved by NP Folaron, and agreed to by physical therapist Joseph DiRienzo ("PT DiRienzo"), who instructed Plaintiff how to use the cane properly. (R. 536, 625).

On February 9, 2010, Plaintiff was discharged from the VA Medical Center in Buffalo, having attended and participated in all his assigned groups. (R. 573). Upon discharge, Plaintiff's diagnosis included polysubstance dependence, antisocial personality disorder, and chronic pain, with risk factors of nonadherence and legal

matters based on Plaintiff's pending criminal charge, and his GAF score was either 50 (R. 575), or 55 (R. 573). Plaintiff's condition was "good, stable" with fair insight/judgment. (R. 576). Although Plaintiff was reported as returning to his family (R. 576), Plaintiff was admitted to the VA Medical Center in Bath, New York, for residential substance abuse rehabilitation, with a planned discharge date of August 9, 2010, at which time it was anticipated Plaintiff would return to the Buffalo area for outpatient treatment. (R. 448, 570-73).

While in the drug rehab program in Bath, Plaintiff blood glucose level was elevated on February 11, 2010. (R. 716). On February 9, 2010, Plaintiff's weight was 308 lbs. (R. 446). Plaintiff underwent a nutrition assessment and was counseled about leading a healthy lifestyle, including diet and exercise, and weighed 302 on February 19, 2010. (R. 445-46). It was recommended that Plaintiff attempt weekly weight loss of 1 to 2 pounds. (R. 447).

At a February 22, 2010 psychiatric evaluation performed by psychiatric nurse practitioner Brenda C. Hammett, RN, NPP ("NPP Hammett") (R. 434-40), Plaintiff reported he was "doing pretty good," although closer examination revealed Plaintiff was stuttering with rumination of topics, and Plaintiff reported difficulties with long and short-term memory. (R. 434). Plaintiff slept six-hours per night and felt rested upon awakening without any shortness of breath, although his roommates stated Plaintiff snored. (R. 435). Plaintiff took quetiapine (antipsychotic) for sleep and to assist with impulse control attributed to his TBI, and nightmares caused by PTSD. (R. 435). Mental status examination revealed Plaintiff was pleasant and cooperative, had some slight fidgeting attributed to back pain and possible TBI, speech was fluent and prosodic

with normal volume and tone but some stuttering, secondary to TBI, affect was slightly anxious/restless, secondary to back pain and TBI, congruent, reactive, with full range, thought processes were goal directed without looseness of association or flight of ideas, some rumination perhaps secondary to TBI, but easily redirected, thought content was free of delusions, suicidal and homicidal ideation and hallucinations were denied, insight was partial, judgment was fair, and Plaintiff had good impulse control.  (R. 437).  Gait was steady with slight limp.  (R. 437).  Plaintiff was assessed with alcohol and cocaine dependence, PTSD by history, personality disorder not otherwise specified, DJD of left ankle with pinning, umbilical hernia, inguinal hernia, low back pain, pain in joint involving lower leg, hypertension, and hyperlipidemia, stressors and risks included lack of housing, unemployment, and lack of sober support system, insight into mental health, substance abuse program, and healthy coping skills.  (R. 439).  Plaintiff's GAF score was 50.  (R. 439).  Treatment plan included continuing quetiapine for mood stabilization, PTSD, impulse control, and sleep, obtaining an EKG, ophthalmology examination, neuropsy examination, and psychotherapy groups for anger and stress management. (R. 439-40).

On February 23, 2010, Plaintiff attended substance abuse group therapy, and vocational and rehabilitation seminars, made good progress with his therapy program and attended a discharge planning, setting goals for continued outpatient treatment.  (R. 416-33, 830-39).  On February 24, 2010, Plaintiff complained to RN Tracy A. Lott ("RN Lott") of chronic back pain, as well as new pain in his right foot, but declined further evaluation of his pain.  (R. 420).

On March 4, 2010, Plaintiff was evaluated by chiropractor Jason G. Napuli, D.C. ("Dr. Napuli"), for complaints of low back pain, estimated as 7.5 to 8 out of ten that radiated into his left leg and ankle for which heat was palliative, but lying down was the only way to relieve the pain. (R. 612-20). Plaintiff reported walking aggravated the pain, but his exercises did help "a little when he does them" which was only "every once in a while." (R. 617). Examination showed restricted range of lumbar motion, including moderate to severe restriction of flexion, severe restriction of extension with low back pain, moderate restriction of left and right rotation with low back pain, and moderate restriction of left and right lateral flexion with low back pain. (R. 618). Dr. Napuli's impression was spondylosis of the lumbar spine, lumbar somatic dysfunction, lumbar radiculopathy of the left lower extremity, lumbago, degenerative disc disease at L5-S1, and old compression fracture of T12, and a conservative course of care was recommended, including application of hot moist pack to the lumbar region, manual soft tissue manipulation with passive stretching to hypertonic musculature, flexion-distraction manipulative therapy to lumbar spine, manual spinal manipulation of the lumbar spine, and home exercises, including lumbar stabilization, stretching, and strengthening. (R. 619-20).

At a March 19, 2010, monthly pain status follow-up, Plaintiff's RN Lynn K. Potter ("RN Potter"), reported Plaintiff continued to complaint of pain in his spine, legs, hips, and right shoulder, but reported his pain was "currently managed" with pain medication being effective. (R. 510-11). On that date, Plaintiff weighed 305 lbs. (R. 511).

On March 23, 2010, Plaintiff underwent and attended an overnight polysomnography for obstructive sleep apnea based on excessive daytime sleepiness

unexplained by other factors, and observed choking or gasping during sleep reported by his roommates. (R. 592-97. The findings of the sleep consult, which was performed by M. Jeffrey Mador, M.D. ("Dr. Mador"), were consistent with moderate obstructive sleep apnea syndrome, for which Plaintiff was encouraged to lose weight, and avoid alcohol and any sedatives, and nasal CPAP therapy was recommended. (R. 594).

On March 31, 2010, Plaintiff underwent a physical rehabilitation consultation for complaints of right shoulder pain, performed by physical therapist Marc Matthew Negrotto, PT DPT ("PT Negrotto"). (R. 583-86). Upon examination, PT Negrotto observed Plaintiff to be "a large male, in no obvious pain," whose use of his right shoulder seemed "normal" without any "guarding," with full range of motion without impingement or increased pain. (R. 586). Drop arm test was negative with pain, biceps test was negative without pain, and Hawkins-Kennedy test was negative. (R. 586). A March 31, 2010 X-ray of Plaintiff's right shoulder showed no acute findings. (R. 711-12). PT Negrotto assessed supraspinatus pain, likely caused by injury ten years prior, and which is now chronic, but which did not influence strength or mobility. (R. 586). Treatment plan included dexamethasone (anti-inflammatory steroid) by iontophoresis (physical therapy technique using electric current to deliver dexamethasone into the body), active assistive range of motion ("AAROM"), heat/ice modalities, and a combination of electric stimulation and ultrasound therapies, twice a week for four weeks. (R. 586).

On April 2, 2010, Plaintiff's tentative discharge date was May 9, 2010. (R. 429). Plaintiff was given a two-day pass to go to Buffalo from April 2 to April 4, 2010, but a breathalyzer test given when Plaintiff returned to the VA Medical Center in Bath, was

positive for alcohol, and Plaintiff admitted drinking a 40-oz. beer at 4:00 a.m. on April 4, 2010, while eating bar-b-qued ribs because he was "bored" and "bugging" because he was alone, did not think his alcohol use would be detected and forgot that he would have to submit to a breathalyzer upon returning to the program.  (R. 746).

On April 5, 2010, Plaintiff underwent a neuropsychological evaluation performed by clinical psychologist James Kittleson, Psy.D. ("Dr. Kittleson").  (R. 740-45).  Based on the test administered, Plaintiff showed average speech and language abilities, visual-spatial functioning, and verbal intellectual functioning, varied attention/concentration and memory abilities with immediate memory abilities stronger than delayed memory abilities, low-average mental flexibility and mental control, with verbal abilities stronger than non-verbal (performance) abilities, and significantly impaired processing speed. (R. 743-44).  Dr. Kittleson noted Plaintiff's profile was consistent with having suffered mild TBI.  (R. 744).

Plaintiff was again treated by Dr. Napuli on April 5, 2010, at which time moderate restrictions in Plaintiff's lumbar spine with low back pain were noted.  (R. 749-50).  Dr. Napuli assessed spondylosis of the lumbar spine, lumbar somatic dysfunction, lumbar radiculopathy of the left lower extremity, lumbago, degenerative disc disease at L5-S1, and old compression fracture of T12, with conservative course of treatment recommended.  (R. 749-50).

On April 7, 2010, Plaintiff's blood glucose level was elevated (R. 716), and hemoglobin A1c test, showed elevated blood sugar.  (R. 722).  Plaintiff was diagnosed with diabetes.  (R. 570, 581-82).  Plaintiff also met with the Domiciliary Residential Rehabilitation Treatment Program ("DRRTP") Appeals Board to review and discuss the

recommendation that Plaintiff be discharged from treatment based on his recent relapse and use of alcohol on April 4, 2010. (R. 736). The Appeals Board allowed Plaintiff to stay in treatment based on his limited insight and commitment to six months as opposed to the standard three months usually allotted for treatment. (R. 736).

Plaintiff received chiropractic treatment for his low back pain on April 7, 12, and 15, 2010. (R. 617-20, 901-04, 912-14, 924-26). At each appointment, Plaintiff reported his lumbar pain improved for a few hours after chiropractic treatment, Dr. Napuli noted Plaintiff's compliance with recommended home care treatment was "good" or "poor," and conservative treatment continued to be recommended. (R. 617-20, 901-04, 912-14, 924-26).

On April 15, 2010, Plaintiff's service connected disability based on his L5-S1 disc herniation with thoracolumbar spondylosis and old mild compression of T12-T11 vertebrae was increased from 10% to 20%. (R. 662-64). An April 16, 2010 X-ray of Plaintiff's right foot showed no acute osseous abnormalities. (R. 710-11).

Although Plaintiff had been advised to extend his stay in the domiciliary SART program to September 2010 (R. 460), on April 26, 2010, Plaintiff reported to social services assistant Merle J. Tobias ("Tobias"), that to avoid losing his non-service connected ("NSC") pension, he would be leaving the program. (R. 893-94). Arrangements were then made for Plaintiff to be discharged on April 30, 2010, at which time Plaintiff was to resume living with his grandmother in Buffalo. (R. 893-94). While in the SART program, Plaintiff had participated in stress management groups, practiced his social skills, was compliant with medications and behavioral health appointments and recommendations, and reported reduced anxiety and received assistance in

dealing with his depression, but had not completed his mental health plan nor reached all his mental health care goals. (R. 881-84). Upon his discharge on April 30, 2010, it was noted Plaintiff "has done well since admission and other than gaining 25 pounds, he has met his personal goals." (R. 570). Plaintiff had been scheduled to receive, as an inpatient, instruction on diabetes management on May 12, 2010, but the appointment was cancelled because Plaintiff was discharged on April 30, 2010. (R. 581-83).

On May 6 and 7, 2010, Plaintiff met with social worker Daniel Stegeman, LMSW ("CSW Stegeman"), for substance abuse assessment in connection with possible admission into a substance abuse treatment program at the Altamont House for homeless veterans. (R. 58, 872-81). Plaintiff reported he "loves life" and "wants to turn his life around," and would benefit from seeing a mental health counselor. (R. 879). Plaintiff again met with CSW Stegeman on May 11, 2010 to establish a treatment plan, at which time CSW assessed Plaintiff as in need of safe and permanent housing, mental and emotional stability, and to maintain sobriety and associate with positive people, yet Plaintiff remained "motivated to give back to the community" and to be a "good role model to others," and stated his desire to volunteer as a football coach. (R. 869-70). Plaintiff's long-term goals included full-time, permanent employment, building a family, reestablishing relationships with his family, and building a sober support group. (R. 870). Plaintiff also stated he was satisfied with his living arrangements at that time. (R. 869).

At a routine physical on June 11, 2010, Plaintiff weighed 302 lbs. (R. 579, 845). Plaintiff's complaints included chronic back pain, left leg weakness and numbness, and right hip pain. (R. 844). Physical examination was normal except for low spinal

tenderness (R. 847), and an X-ray of Plaintiff's right hip showed moderate DJD. (R. 710). Plaintiff also attended group therapy for substance abuse treatment on June 11 and 14, 2010. (R. 841-43).

At the July 28, 2010 administrative hearing, Plaintiff attributed his disability, which commenced on February 16, 2006, to herniated discs in his lumbar spine, depression, anxiety, PTSD, left leg and ankle injuries, a shoulder problem, and a hip problem. (R. 40-41). Plaintiff then weighed 315 lbs. and was 5' 10" tall. (R. 43). According to Plaintiff, he was receiving disability from the VA for 40% service connected disability of his back and leg, and also received a non-service connected pension. (R. 42). Plaintiff testified he had not consumed alcohol or used drugs since January 2010, except for one 40-oz. beer he drank in April 2010. (R.44). For his hearing, Plaintiff ambulated with the assistance of crutches which Plaintiff explained he had received the previous day after he fell down the steps, but otherwise used a cane he was prescribed in January 2010. (R. 45-46).

Plaintiff characterized his drug and alcohol abuse as "self-medicating" for management of his chronic back pain. (R. 46, 58). Plaintiff explained that he could not stand for more than five or six minutes without his back "freezing up" or "tightening," that it hurt all day regardless of whether he was sitting or lying down, requiring Plaintiff to "constantly squirm" and move. (R. 46). Plaintiff described his back pain as "radiating," that if felt like a "knife stuck in [his] butt," and "burns" and "radiates" down his body from his middle back to his legs, and was spreading to his right side. (R. 46-47). Plaintiff explained that his right rotator cuff was "gone" as the result of an injury sustained while fighting a fire. (R. 48). Plaintiff described how it was difficult to get out of bed, that he

sometimes could not get to the bathroom or control his muscles because of medication effects, he would cough hard, vomit, and sometimes experienced incontinence. (R. 48, 54).

Plaintiff testified that he was able to tend to "very little" of his basic needs, explaining he had difficulty putting on socks, and he could make baloney sandwiches if he sat down, but he depended on assistance from the other 40 vets with whom he then lived at a homeless shelter where he had been since May 2010. (R. 49, 52, 56). Plaintiff had chosen not to live with an uncle who "drinks a lot" and has dementia, his grandmother was elderly, and he did not get along with his sister who was upset that Plaintiff was not the same person he used to be. (R. 57). Plaintiff could drive, did not drive because of side effects from medication, including dizziness and sleepiness, and Plaintiff did not have a vehicle. (R. 50, 52). Plaintiff continued to attend group therapy sessions for his mental health issues, including flashbacks and nightmares from PTSD, and sleep difficulties, estimating he slept for only three or four hours a night, despite sleep medication which took two to three hours to "kick in." (R. 50, 54, 56). Plaintiff's acceptance into a vocational rehabilitation program had been delayed because Plaintiff could not concentrate and was not able to manage his life. (R. 51). Plaintiff's spent his days reading, and in bed where he was most comfortable, and he could not sit or walk very long before his hip would go out. (R. 52-53). Plaintiff attributed his recent weight gain to side effects from medication because he did not eat much. (R. 55).

According to Plaintiff, he never used drugs until he was 35 years old and was injured while on duty as a firefighter. (R. 59). Plaintiff maintains he was first injured at work in 1999, but continued to work, including intermittent assignments to light duty

when he was repeatedly injured. (R. 59). In 2002, Plaintiff was offered benefits under New York General Municipal Law 207A,[5] but declined the offer because he was not ready to retire. (R. 59). After several more years, Plaintiff's "body just quit," and "it never tried to come back," but "just gets worse and worse." (R. 59). At that point, Plaintiff started to "lose [his] mind" and began "self-medicating" by drinking and when alcohol alone did not help, Plaintiff started using drugs. (R. 59-60).

At the request of the ALJ, VE Steinbrenner testified that Plaintiff's past relevant work as a firefighter was skilled work at a "very heavy exertion level," which Plaintiff could no longer perform. (R. 62). The ALJ posed a hypothetical in which the individual's impairments limited the individual to a full range of sedentary work, with a sit/stand option, and occasionally understanding, remembering, and carrying out complex and detailed tasks, occasionally do all posturals, and interact with the public, but no limits to interacting with coworkers and supervisors, to which VE Steinbrenner responded the hypothetical individual could not perform Plaintiff's past work as a firefighter, that Plaintiff's firefighting skills were not transferrable, but could work as a switchboard operator, a position which has recently been reclassified with the introduction of computerized phone systems significantly reducing the number of calls handled. (R. 63-64). The only other job the hypothetical individual could perform was surveillance systems monitor, provided it was not combined with security work. (R. 64). In response to further questioning from the ALJ, VE Steinbrenner explained that a moderate to significant limitation on making adequate decisions and dealing with stress

---

[5] Under New York General Municipal Law 207A, Plaintiff would have received from the City of Buffalo pay equal to his current salary for being injured while working as a firefighter.

would not render the hypothetical individual unable to perform either the switchboard operator or surveillance systems monitor positions. (R. 65-66).

## **DISCUSSION**

### 1.    **Standard and Scope of Judicial Review for Disability Determination**

Under the Social Security Act, a court's review of the Commissioner's final decision is limited to determining whether the ALJ's decision is supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007). "The Supreme Court has defined 'substantial evidence' as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004) (citing *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). The Commissioner's factual findings are "'binding' when 'supported by substantial evidence,'" yet if an error of law affects the disposition of the case, the court "cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency simply by deferring to the factual findings of the ALJ." *Pollard*, 377 F.3d at 189.

When evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating

physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d)*; Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[6] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).


### A.      Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion."  *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and…educational background, age and work experience."  *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of

---

[6] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

the treating physician is supported by medically acceptable techniques and result from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d). Further, in determining whether a claimant is disabled, the ALJ is required to address multiple impairments in combination and to consider their cumulative effect as well as the combined effects of nonsevere impairments. 20 C.F.R. § 404.1523; *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) (the SSA must evaluate the "combined impact [of a claimant's impairments] on a claimant's ability to work, regardless of whether every impairment is severe"); *Koseck v. Secretary of Health and Human Services*, 865 F.Supp. 1000, 1010 (W.D.N.Y. 1994) (citing cases).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker*, 712 F.2d at 1550; 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). "Congress has instructed…that the factual findings of the Commissioner, if supported by substantial evidence shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits. 20 C.F.R. §§ 404.1520, 416.920. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982). The first step is to determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits. *Id.* The next step is to determine whether the applicant

has a severe impairment, which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations. 20 C.F.R. §§ 404.1520(c), 416.920(c). Absent an impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry*, 675 F.2d at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the

burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry*, 675 F.2d at 467. In reviewing the administrative findings, the court must follow this five-step analysis to determine if there was substantial evidence on which the Commissioner based her decision. *Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).

### B. Substantial Gainful Activity

The first inquiry is to determine whether the applicant is engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit." 20 C.F.R. §§ 404.1510 and 416.910.

In the present case the ALJ concluded that Plaintiff did not engage in any substantial gainful activity since February 15, 2006, the alleged onset date of his disability. (R. 18). This finding is not disputed.

### C. Severe Physical or Mental Impairment

The second step of the analysis is to determine whether the applicant had a severe physical or mental impairment significantly limiting her ability to do "basic work activities." "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work

situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that the medical evidence shows that Plaintiff suffered from impairments consisting of " status post multiple brain trauma by history only with mild cognitive limitations, drug and alcohol abuse in partial remission at time with some relapses, spondylosis of the lumbar spine, lumbar somatic dysfunction, radiculopathy of the left lower extremity, lumbago and degenerative disc disease of the L5-S1.  (R. 18). The AL considered Plaintiff's impairments severe, with the exception of the lumbar spine problems which were considered mild.  (R. 18).   The ALJ further found Plaintiff "also has or may have the [ ] 'non-severe' impairments [of] depression and sleep apnea."  (R. 18).  Plaintiff contests the ALJ's failure to find Plaintiff also suffered from severe anxiety and PTSD, and to consider the effect of Plaintiff's obesity on such impairments.  Plaintiff's Memorandum at 13-21.


### 1.    Combination of Impairments

Plaintiff argues the ALJ failed at Step 2 to find Plaintiff's anxiety, PTSD, and obesity to be severe impairments, and to consider all Plaintiff's impairments, whether severe or non-severe, in combination.  Plaintiff's Memorandum at 19-21.  In opposition, Defendant asserts the ALJ was not required to consider as severe any impairment that does not significantly limit Plaintiff's physical or mental capacity to perform basic work activities, Defendant's Response at 7-8, that the ALJ nevertheless did consider the

effects of Plaintiff's non-severe impairments in his RFC assessment, *id.* at 8-9, and that even if the ALJ erred in failing to find Plaintiff's anxiety and PTSD to be severe impairments, such error was harmless because at the fifth step of the sequential analysis, the ALJ included Plaintiff's mental limitations in the RFC described in the hypothetical posed to the VE, *id.* at 9-10.  In further support of his motion, Plaintiff argues the record is incomplete because it does not contain all of the VA medical records and, thus, the ALJ could not possible determine the severity of Plaintiff's anxiety and PTSD.  Plaintiff's Reply at 8.  According to Plaintiff, because his most recent non-service connected disability for pension purposes is anxiety disorder, not otherwise specified, which was evaluated at 70% disabling, Plaintiff's anxiety "hardly sounds like an impairment with just minimal limitations."  (Plaintiff's Reply at 9).

Plaintiff's assertion that the ALJ was required to consider Plaintiff's multiple impairments in combination, and to consider their cumulative effect as well as the combined effects of non-severe impairments, Plaintiff's Memorandum at 19-21, is correct.  20 C.F.R. § 404.1523; *Thompson v. Astrue*, 416 Fed.Appx. 96, 97 (2d Cir. 2011) ("Where, as here, the claimant has more than one impairment, the ALJ just account for the combined effect of all impairments on a claimant's ability to work, regardless of whether each impairment is severe." (citing *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995)); *Walterich v. Astrue*, 578 F.Supp.2d 482, 503 (W.D.N.Y. 2008).  Nevertheless, the record establishes the ALJ did, as required, consider cumulative effects of Plaintiff's impairments.

Preliminarily, insofar as Plaintiff challenges the ALJ as failing to obtain and review all pertinent medical records from the VA, Plaintiff's Memorandum at 13-14;

Reply at 8, Plaintiff is referring to the March 3, 2009 VA Disability Determination, submitted as pages 658-61 of the Administrative Record, a plain reading of which establishes the third page of such exhibit, *i.e.*, p. 660, ends mid-sentence in a discussion of the evidence considered by the VA in evaluating Plaintiff's mental impairments.  According to Plaintiff, that the March 3, 2009 VA Disability Determination appears to be missing a page establishes that the ALJ did not have all the medical records necessary to make his determination.  Plaintiff's Memorandum at 13-15; Plaintiff's Reply at 8-9.  Such argument is, however, presumptive as substantial evidence supports the ALJ's determination that Plaintiff's anxiety disorder was not disabling.  Significantly, although on June 24, 2008, Plaintiff's GAF was assessed as 40 (R. 219-20), and, according to the March 3, 2009 VA Disability Determination, was assessed in connection with a January 29, 2009 VA examination at 45 (R. 660), on February 22, 2010, Plaintiff's GAF score was 50 (R. 575), and possibly 55 (R. 573), strongly implying Plaintiff's GAF score had improved since June 24, 2008, and rendering the January 29, 2009 GAF of 45 obsolete.  Moreover, assuming, *arguendo*, part of the March 3, 2009 VA Disability Determination is missing from the record, such fact would have no effect on the validity of the ALJ's determination in this case because the VA's Disability Determination is not binding on the ALJ in this action.  *See* Discussion, *infra*, at 55.

The ALJ specifically stated in his decision that in reaching the conclusion that Plaintiff is not disabled, he considered all of Plaintiff's impairments, including those he determined were "severe" – status post multiple brain trauma by history with mild cognitive limitations, substance abuse in partial remission with some relapses, Plaintiff's

lumbar spine impairments, as well as those he determined were "non-severe" –
basically, sleep apnea and depression, and the physical and mental limitations posed
by such impairments. (R. 18-20).

Moreover, even if the ALJ erred by failing to consider Plaintiff's anxiety, PTSD,
and obesity to be severe impairments, such error was harmless because the ALJ,
having identified some severe impairments at Step 2, proceeded to address the
remaining three steps of the sequential analysis. *See Stanton v. Astrue*, 370 Fed.Appx.
231, 233, n. 1 (2d Cir. Mar. 24, 2010) (noting no error warranting remand would occur
where ALJ, having identified severe impairments at step 2, proceeds through the
remaining steps of the disability determination sequential evaluation process); *Rosa v.
Colvin*, 2013 WL 1292145, at *8 (N.D.N.Y. Mar. 27, 2013) ("any claimed error at step
two is harmless since the ALJ proceeded beyond it in the sequential analysis").

### 2. Obesity

Plaintiff argues the ALJ failed to consider the combined effects of Plaintiff's
obesity and his other impairments, as required by SSR 02-1p, and erred in failing to find
Plaintiff's morbid obesity to be a severe impairment. Plaintiff's Memorandum at 18-19.
In opposition, Defendant asserts the ALJ did consider Plaintiff's obesity, but because
the record is devoid of any evidence establishing any limiting effects attributed to
Plaintiff's obesity, the ALJ was not required to discuss such effects. Defendant's
Response at 6-7. In further support of his motion, Plaintiff maintains the ALJ's sole
mention of Plaintiff's obesity, a reference to one physician's diagnosis of obesity on
September 30, 2008, the failure to recognize that Plaintiff's BMI of 42.72 classifies

Plaintiff in Class III Morbid Obesity, which is the highest obesity classification, and the failure to discuss the "subtle" effects of Plaintiff's obesity, including his sleep apnea and depression, on Plaintiff's mental impairments, was in error. Plaintiff's Reply at 7-8.

The ALJ must also consider any additional and cumulative effects of Plaintiff's obesity when determining whether Plaintiff has a listing level impairment or a combination of impairments that medically equals the severity of a listed impairment. Social Security Ruling ("SSR") 02-1p, 2000 WL 628049 at *5 (S.S.A. Sept. 12, 2002). Where the record contains evidence of limiting effects from a claimant's obesity, the ALJ must consider the impact of Plaintiff's obesity together with the Plaintiff's related impairments. *Sotack v. Astrue*, 2009 WL 3734869, at *5 (W.D.N.Y. Nov. 4, 2009)(ALJ is required to consider the impact of Plaintiff's obesity together with Plaintiff's related impairments when record contains evidence of Plaintiff's obesity and limiting effects). Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities. *Rockwood v. Astrue*, 614 F.Supp.2d 252, 276 (N.D.N.Y. 2009) (citing *Day v. Commissioner of Social Sec.*, 2008 WL 2331401, at * 5 (N.D.N.Y. June 3, 3008) (no obligation for ALJ to discuss obesity where examining physicians failed to discuss Plaintiff's obesity as a contributing factor to Plaintiff's impairments)).

Here, the record establishes that Plaintiff is obese (R. 226, 340), and even "morbidly obese" (R. 390), a fact the ALJ did consider (R. 22-23), but did not discuss whether Plaintiff's obesity negatively affected Plaintiff's ability to work. Plaintiff,

however, fails to point to any evidence in the record indicating that Plaintiff's treating or examining sources considered Plaintiff's obesity a significant factor relative to Plaintiff's ability to perform basic work activities, nor has the court located any such evidence. Significantly, in the absence of any evidence in the record that the effects of Plaintiff's obesity further limited Plaintiff's ability to work, the ALJ was not obligated to discuss Plaintiff's obesity. *See Farnham v. Astrue*, 832 F.Supp.2d 243, 261 (W.D.N.Y. 2011) (holding where "the record establishes that Plaintiff is obese . . ., but is otherwise devoid of any evidence that Plaintiff's treating or examining sources considered Plaintiff's obesity a significant factor relative to Plaintiff's ability to perform basic work activities . . . the ALJ had no duty to discuss Plaintiff's obesity under . . . the Act."). As such, the ALJ was not required under the Act to discuss Plaintiff's obesity.

The ALJ's determination that Plaintiff's impairments, neither alone nor in combination, meets the criteria to establish disability under the Act is thus supported by substantial evidence in the record.

### D. Listing of Impairments, Appendix 1

The third step is to determine whether any of a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("the Listing"). If the impairment or impairments are listed in the Appendix and the listing's durational requirements are satisfied, the impairment or impairments are considered severe enough to prevent an individual from performing any gainful activity and the individual is deemed disabled, regardless of the applicant's age, education or work experience. 20 C.F.R. § 404.1525 (a) and 416.925(a); *Melville v. Apfel*, 198 F.3d

45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled").

The ALJ found Plaintiff does not have an impairment or combination of impairments meeting or medically equal to one of the listed impairments in the Listing. (R. 19). Significantly, Plaintiff does not argue that any of Plaintiff's impairments met the criteria to establish disability based on an impairment in the Listing of Impairments.

The relevant listing impairments in the present case include 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04 (Disorders of the Spine) ("§ 1.04") for Plaintiff's herniated disc and degenerative disc disease; § 12.02 (Organic Mental Disorders) ("§ 12.02") for Plaintiff's cognitive limitations based on history of status post multiple brain trauma[7]; § 12.04 (Affective Disorders) ("§ 12.04") for Plaintiff's depression; § 12.06 (anxiety-related disorders) ("§ 12.06") for Plaintiff's PTSD and anxiety; and § 12.09 (substance abuse disorders) ("§ 12.09") for Plaintiff's alcohol and drug abuse disorder, as well as any cumulative effects of Plaintiff's obesity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00I1.

Although the ALJ failed to consider the listing impairments for disorders of the spine,[8] affective disorders, and anxiety-related disorders, such failure does not require remand when there is absolutely no evidence supporting them. *See Bergeron v. Astrue*, 211 WL 6255372, at * 11 (D.Vt. Dec. 14, 2011) (holding ALJ's failure to analyze claimant's depression under relevant Listings of Impairments section did not require remand where

---

[7]  Insofar as Plaintiff's status post multiple brain trauma by history can be construed as traumatic brain injury, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00F provides the criteria for assessing such alleged disability are contained in § 11.18, which requires evaluation under §§ 11.02 (epilepsy - convulsive), 11.03 (epilepsy - nonconvulsive), 11.04 (central nervous system vascular accident), and 12.02 (organic mental disorders), as applicable.  In the instant case, there being no evidence in the record that Plaintiff has either convulsive or nonconvulsive epilepsy, or has had a central nervous system vascular accident, Plaintiff's multiple brain trauma is considered only under § 12.02.

[8] The court notes the ALJ considered whether Plaintiff's was disabled based on an impairment of his musculoskeletal system, pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A-C).  (R. 19).

substantial evidence in the record supported ALJ's determination that depression did

not prevent claimant from engaging in substantial gainful activity).


### 1.    Disorders of the Spine

Disability based on a disorder of the spine, including an herniated disc or

degenerative disc disease, will be found under § 1.04 where, as relevant here, evidence

in the record establishes degenerative disc disease, resulting in compromise of a nerve

route or the spinal cord, with

> A.  Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss and, it there is involvement of the lower back, positive straight leg
> raising test (sitting and supine);
> or
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of
> tissue biopsy, or by appropriate medically acceptable imaging, manifested by
> severe burning or painful dysesthesia, resulting in the need for changes in
> position or posture more than once every 2 hours;
> or
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by
> findings on appropriate medically acceptable imaging, manifested by chronic
> nonradicular pain and weakness, and resulting in inability to ambulate effectively,
> as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.

In the instant case, the evidence in the record fails to establish Plaintiff meets the

criteria for disability based on his spinal disorder.

In particular, although the record establishes Plaintiff has a history of moderate

herniated disc at L5-S1 (R. 226), and has degenerative disc disease, also as L5-S1 (R.

619, 749), and despite evidence of some pain radiating into his lower extremities and

limitations of motion of spine, because Plaintiff's spinal disorder involves the lower back,

such symptoms must also be accompanied by "positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.A. Plaintiff's straight-leg raising test, both sitting and supine, however, is negative, bilaterally. (R. 241 (December 1, 2008), 298 (December 23, 2009), and 619 (March 4, 2010)). Nor is there any evidence in the record that Plaintiff's spinal disorder is accompanied by spinal arachnoiditis, as required under § 1.04B, or lumbar spinal stenosis, as required by § 1.04C. As such, Plaintiff cannot establish disability based on his spinal disorder.

### 2. Mental Impairments

Disability for an organic mental disorder is defined under § 12.02, which classifies organic mental disorders as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02. The required level of severity to be disabled under § 12.02 "is met when the requirements of both A and B are satisfied, or when the requirements in C are satisfied." *Id.* Specifically,

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
> 1. Disorientation to time and place; or
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
> 4. Change in personality; or
> 5. Disturbance in mood; or
> 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
> AND

B.       Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C.       Medically documented history of a chronic organic mental disorder
of at least 2 years' duration that has caused more than a minimal limitation
of ability to do basic work activities, with symptoms or signs currently
attenuated by medication or psychosocial support, and one of the
following:

1. Repeated episodes of decompensation, each of extended
duration; or

2. A residual disease process that has resulted in such marginal
adjustment that even a minimal increase in mental demands or
change in the environment would be predicted to cause the
individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a
highly supportive living arrangement, with an indication of continued
need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 (§12.02").

In the instant case, neither Plaintiff's status post multiple brain trauma by history, nor his

mild cognitive limitations satisfy the criteria for disability based on organic mental

disorders.

Specifically, the record is completely devoid of evidence establishing that Plaintiff

is "markedly restricted" as to activities of daily living, maintaining social functioning, or

maintaining concentration, persistence or pace, or that Plaintiff has had any episodes of

decompensation and, as such, Plaintiff cannot satisfy the criteria under § 12.02B,

rendering analysis of the criteria under § 12.02A unnecessary because the criteria of

both § 12.02A and B must be met.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  Nor

does the record contain evidence that Plaintiff's organic mental disorder meets the

criteria under § 12.02C, including any episodes, let alone repeated episodes, of

decompensation, or a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or environmental changes would be predicted to cause Plaintiff to decompensate, or at least a one-year history of inability to function outside a highly supportive living arrangement with indication such arrangement would need be continued.  As such, the ALJ's finding that Plaintiff's organic mental disorder, including his status post multiple brain trauma by history, and mild cognitive impairments does not rise to the severity necessary to be considered disabled based on the listing impairment for organic mental disorder, is supported by the record.

According to § 12.04, an affective disorder is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04.  In the instant case, Plaintiff's affective disorder is properly considered under the criteria for a depressive syndrome. [1]  In order for an applicant to be found disabled under § 12.04 based on depression, Plaintiff must meet the requirements of both subsections A and B, or the requirements of subsection C.  *Id.*

Specifically, the record establishes that Plaintiff meets the initial criteria for disability based on depressive syndrome which is

A.  Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or

---

[1] Because 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04A(2) pertains to disability based on manic syndrome, a diagnosis inapplicable to Plaintiff, it is not discussed.

f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking.

* * *

AND
B.  Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04.

Here, although there is some medically documented evidence in the record of either

continuous or intermittent appetite disturbance with change in weight, § 12.04A1b, sleep

disturbance, § 12.04A1c, decreased energy, § 12.04A1e, and difficulty concentration or

thinking, § 12.04A1g, the record, as discussed in connection with § 12.02, organic

mental disorders, Discussion, *supra*, at 40-41, the record is completely devoid of any

evidence that Plaintiff is "markedly restricted" as to activities of daily living, maintaining

social functioning, or maintaining concentration, persistence or pace, or that Plaintiff has

had any episodes of decompensation, two of which need be established to satisfy §

12.04B.  Nor is there any evidence that Plaintiff's depressive syndrome meets the

criteria under § 12.04C, specifically, repeated episodes of decompensation, that a

minimal increase in mental demands or environmental changes would be predicted to

cause Plaintiff to decompensate, or at least a one-year history of inability to function

outside a highly supportive living arrangement with indication such arrangement would

need be continued.  *Cf. Kane v. Astrue*, 2012 WL 4510046, at * 16 (W.D.N.Y. Sept. 28,

2012) (remanding for calculation of benefits where evidence in the record "compellingly

establishe[d]" the claimant was at high risk of decompensating "in the event of additional

stressors and possibly relapsing into full-blown alcohol and/or drug use.").  Accordingly,

in the absence of substantial evidence to the contrary, that Plaintiff is not disabled under

§ 12.04 based on his depressive disorder is supported by the record.

Nor does the record contain any evidence that Plaintiff is disabled based on

anxiety or PTSD, which requires satisfying the requirements of both A and B, or both A

and C, including

A. Medically documented findings of at least one of the following:
1. Motor tension; or
2. Autonomic hyperactivity; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:
1. Marked restrictions of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.06.

Although in the instant case, the record contains some medically documented evidence that Plaintiff has recurrent recollections of a traumatic experience (R. 219, 287, 402, 435, 742), as well as some self-reported evidence (R. 50,), thus satisfying § 12.06A, the record does not contain any evidence that Plaintiff, as discussed in connection with organic mental disorder and depressive disorder, Discussion, *supra*, at 40-41, is "markedly restricted" as to activities of daily living, maintaining social functioning, or maintaining concentration, persistence or pace, or that Plaintiff has had any repeated episodes of decompensation to satisfy § 12.06B. Nor is there any evidence in the record that Plaintiff's anxiety or PTSD has resulted in Plaintiff's "complete inability to function independently outside the area of [his] home," as required under § 12.06C. As such, because Plaintiff's anxiety or PTSD must meet the criteria of either both § 12.06A and B, or § 12.06A and C, no evidence in the record establishes Plaintiff is disabled under § 12.06.

Nor does the record contain substantial evidence establishing Plaintiff is disabled based on his substance abuse disorder under § 12.09, the severity of which requires meeting the requirements of one of the following: organic mental disorders under § 12.02, depressive syndrome under § 12.04, anxiety disorders under § 12.06, personality disorders under § 12.08, peripheral neuropathies under § 11.14; liver damage under § 5.05, gastritis under § 5.00, pancreatitis under § 5.08; or seizures under § 11.02 (epilepsy - convulsive) or § 11.03 (epilepsy - non-convulsive). Rather, as discussed, Discussion, *supra*, 39-44, the record fails to establish that Plaintiff's impairments meet the criteria for disability under §§ 12.02, 12.04, or 12.06. Nor is there any evidence in

the record that Plaintiff meets the criteria for a personality disorder under § 12.08, the criteria for which includes, *inter alia*, at least two of the following: (1) marked restriction activities of daily living, (2) marked restriction maintaining social functioning, (3) marked restriction maintaining concentration, persistence or pace, or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08B. *See* Discussion, *supra*, at 40-41.

The record is similarly devoid of any evidence that Plaintiff has, under § 11.14, peripheral neuropathies, which require disorganization of motor function, or suffers from liver damage under § 5.05, gastritis under § 5.00, pancreatitis under § 5.08, or any seizures under either 11.02 or 11.03. Accordingly, substantial evidence in the record fails to establish Plaintiff's substance abuse disorder is of the severity required to be disabled under § 12.09.

The ALJ's determination that none of Plaintiff's impairments meets the criteria to establish disability based on an individually listed impairment is thus supported by substantial evidence in the record.

### E. "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in this five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity. *Cosme v. Bowen*, 1986 WL 12118, at *3 (S.D.N.Y. Oct. 21, 1986).

The ALJ determined that Plaintiff is unable to perform his past relevant work as a firefighter. (R. 28). The ALJ further determined that Plaintiff retained the residual functional capacity for sedentary work, with additional limitations of being allowed to alternate between sitting and standing, and nonexertional limitations of occasionally understanding, remembering, and carrying out complex and detailed tasks, occasionally assuming postural positions, and occasionally interacting with the public, but no limitations interacting with co-workers and supervisors. (R. 20). These findings are undisputed.

### F.    Suitable Alternative Employment in the National Economy

Once the claimant has established that he has no past relevant work experience or cannot perform his past relevant work because of his impairments, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with the Plaintiff's residual functional capacity, age, education, and work experience. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). The claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile ("the Grids"). *Decker v. Harris*, 647 F.2d 291, 296 (2d Cir. 1981). Where a plaintiff's nonexertional limitations further significantly limit the plaintiff's ability to work, apart from any incapacity attributed solely to exertional limitations, such that the plaintiff

is unable to perform the full range of employment otherwise indicated by the Grids, the ALJ should obtained testimony from a vocational expert as to the impact of the nonexertional limitations. *Bapp*, 802 F.2d at 603. In this case, relying upon the testimony of the vocational expert and Medical-Vocational Guidelines as a framework for his decision, the ALJ concluded that Plaintiff was not disabled because he could perform other work in the national economy, including sedentary work as a switchboard operator and a surveillance system monitor, both of which exist in significant numbers in the national economy. (R. 29-30).

Plaintiff challenges this finding, arguing the ALJ erred by relying on the VE's testimony which conflicted with the Dictionary of Occupational Titles ("DOT"), Plaintiff's Memorandum at 7-9, by providing the VE with an improper hypothetical regarding the impact Plaintiff's need to alternate sitting and standing would have on Plaintiff's ability to work, *id.* at 9-12; failed to properly evaluate the VA's determination that Plaintiff is disabled, *id.* at 13-15; and failed to properly apply to treating physician's rule, particularly with regard to Dr. Ryan, *id.* at 16-17. Each of Plaintiff's contention at this step of the analysis is without merit.

### 1. DOT Conflict

Plaintiff argues the ALJ erred by relying on the VE's testimony that Plaintiff could perform the jobs of switchboard operator and surveillance systems monitor, both of which, according to the DOT's descriptions, require "Reasoning Skills" of R-3, which is inconsistent with Plaintiff's RFC for which the Reasoning Skills possessed by Plaintiff are between R-1 and R-2. Plaintiff's Memorandum at 7-9. In opposition, Defendant

asserts the VE, in response to the ALJ's questioning, stated that although the switchboard operator was formerly classified at SVP 3, with the introduction of computerized phone systems allowing outside calls to access an extension directly, the New York State Department of Labor ("DOL"), downgraded the job to unskilled and SVP 2 in 2000. Defendant's Response at 2 (citing R. 63). In support of Plaintiff's motion, Plaintiff argues that because Plaintiff's limitations, as the ALJ presented to the VE, include "being able to 'occasionally understand, remember and carry out complex and detailed tasks,'" falling below the DOT's description of a job with Reasoning Skills of R-2, it follows Plaintiff cannot perform jobs with Reasoning Skills of R-3. Plaintiff's Reply at 2 (quoting R. 20).

Initially, although Plaintiff does not specifically address the Reasoning Skills of the surveillance system monitor position, should it be determined that Plaintiff is unable to perform the switchboard operator position, then Plaintiff will be found disabled because "[t]he existence of only one unskilled sedentary job, *i.e.*, surveillance system monitor, indicates that the full range of sedentary work is significantly eroded." *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 55 (W.D.N.Y. 2002) (citing Social Security Ruling[9] ("SSR") 96-9p ("SSR 96-9p") (providing that a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded)). Nevertheless, the ALJ did not err in accepting the VE's testimony that Plaintiff could perform both the switchboard operator and surveillance system monitor positions.

---

[9] "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (quotation omitted); *see* 20 C.F.R. 402.35(b)(1) (Social Security Rulings "are binding on all components of the Social Security Administration" except with regard to claims subjected to certain relitigation procedures).

Plaintiff's argument, that the VE's opinion of Plaintiff's reasoning skills conflicted with the DOT, unresolved by the ALJ, is based on his assertion that Plaintiff's nonexertional limitations, as set forth in his RFC-Mental (R. 254-55), of occasionally understanding, remembering, and carrying out complex and detailed tasks, occasionally assuming postural positions, and occasionally interacting with the public, is below the requirements of a job with R-2 Reasoning Skills, which include the ability to

> [a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

Plaintiff's Reply at 2 (quoting DOT App. C (Components of the Definition Trailer)[10]).

In contrast, a job with R-3 Reasoning Skills requires the ability to

> [a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

*Id.*

Although not discussed by either party, Reasoning Skills for R-1 require the ability to

> [a]pply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situation with occasional or no variables in or from these situations encountered on the job.

DOT – App. C, Components of the Definition Trailer.

According to Plaintiff, because he has the ability to only occasionally understand, remember and carry out complex and detailed tasks, his reasoning would fall somewhere between R-1 and R-2.  Plaintiff's Reply at 2.

---

[10] Although neither party included a copy of DOT App. C, of which the court takes judicial notice, *see Zappier v. Sun Life Assurance Company of Canada*, 2006 WL 2621110, at * 8 & n. 12 (S.D.N.Y. Aug. 10, 2006) ("the Court clearly can take judicial notice of the DOT, which is a United States government publication"), it is available at http://www.occupationalinfo.org/appendixc_1.html#II, *last visited* Sept. 23, 2013.

In support of his argument, Plaintiff relies, Plaintiff's Memorandum at 7-8; Plaintiff's Reply at 1-2, on *Santos v. Astrue*, 709 F.Supp.2d 207 (S.D.N.Y. 2010), in which the court observed that a hypothetical individual described as limited to "simple one or two step tasks" and "simple instructions" was commensurate with a DOT reasoning development level of R-1. *Santos*, 709 F.Supp.2d at 212. Plaintiff extrapolates from *Santos* that Plaintiff's ability to only occasionally understand, remember and carry out complex and detailed tasks places Plaintiff's reasoning development between the R1-R2 level. Such extrapolation, however, is a "leap in logic" and assumes that Plaintiff's ability to only "occasionally understand, remember and carry out complex and detailed tasks" is not at least equal to the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," as required for R-3. Plaintiff provides no authority for this proposition and the court's research reveals none.

SSR 00-4p requires that

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

As such, it is the ALJ's duty to elicit from the VE a reasonable explanation for any "apparent unresolved conflict" between the VE's testimony regarding what jobs the hypothetical individual can perform, and the DOT's descriptions of the requirements for such jobs, and to explain how such conflict has been resolved prior to relying on the VE's testimony.

Where, however, as in this case, there is no actual conflict between the VE's opinion and the DOT, the ALJ need not resolve any conflict. In particular, here, the ALJ asked the VE whether any of the VE's testimony conflicts with the DOT, and the VE noted no conflict. (R. 64-65). Simply put, in the VE's opinion, Plaintiff's ability to "occasionally understand, remember and carry out complex and detailed instructions" is "generally . . . consistent" with the DOT's description of R-3 Reasoning Skills requiring Plaintiff be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form." To find otherwise, as Plaintiff urges, *i.e.*, that being capable of carrying out complex tasks, is not equal to the ability to apply commonsense understanding" would be to elevate "instructions furnished in written, oral, or diagrammatic form" above "detailed instructions," which would be illogical. Thus, the court finds the ability to "occasionally" execute "<u>complex</u> <u>and</u> <u>detailed</u> instructions" is "generally consistent" with the ability to regularly "apply <u>commonsense</u> <u>understanding</u> to carry out instructions furnished in written, oral, or diagrammatic form." (underlining added). Accordingly, the VE's opinion regarding Plaintiff's reasoning level and that required for a surveillance monitor and switchboard operator raised no conflict with the applicble DOT's requirements. Moreover, Plaintiff's attorney had a chance at the administrative hearing to cross-examine the VE regarding any perceived conflicts between Plaintiff's residual functional capacity and the specific job descriptions of both positions as set forth in the DOT, but did not do so. *See Wellington v. Astrue*, 2013 WL 1944472, at * 4 (S.D.N.Y 2013) (indicating "plaintiff's attorney had a chance to cross-examine the VE at the hearing regarding any conflicts but did not do so," and thereby waived such argument).

As such, the ALJ did not err in failing to reconcile any inconsistency between the VE's testimony and the DOT job description for the two positions identified by the VE as able to be performed by a hypothetical individual with the same residual functional capacity as Plaintiff.

### 2.    Hypothetical

Plaintiff argues the ALJ erred by providing the VE with an improper hypothetical regarding the impact Plaintiff's need to alternate sitting and standing would have on Plaintiff's ability to work without specifying how often and for how long Plaintiff would have to alternate sitting and standing, in violation of SSR 83-12 and 96-9p.  Plaintiff's Memorandum at 9-12.   Defendants argues in opposition that the hypothetical posed by the ALJ to the VE was consistent with a "discretionary sit-stand option" that has been accepted by District Courts within the Second Circuit, and that the VE's identification of two jobs for which Plaintiff possessed the residual functional capacity to perform took into consideration Plaintiff's need to alternate sitting and standing.  Defendant's Response at 3.  In further support of his motion, Plaintiff maintains the ALJ's indication that Plaintiff "'has the residual functional capacity to perform sedentary work . . . except with sit/stand option,'" describes "a very general and vague limitation" that fails to comply with SSR 96-9p.  Plaintiff's Reply at 3-4 (quoting R. 20).

The stated purpose of SSR 96-9p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do

other work." As relevant to a claimant's need to alternate sitting and standing, SSR 96-9p provides

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in this record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p.

In the instant case, the hypothetical posed by the ALJ to the VE included that the individual's limitations allowed him to "do the full range of sedentary work as it's defined under regulations, but would need a sit/stand option, and would have . . . nonexertional limitations." (R. 26). Although Plaintiff characterizes this "sit/stand option" as "very general and vague," Plaintiff's Reply at 3, and thus different from the "discretionary" sit/stand option discussed in *Scrufari v. Astrue*, 2012 WL 912925, at *10 (W.D.N.Y. Feb. 28, 2012) (discussing jobs in which the claimant could alternate sitting and standing at his discretion), that the ALJ in the instant did not specify the frequency with which Plaintiff would need to alternate sitting and standing, or the duration for which Plaintiff would need to maintain sitting or standing, logically construed, establishes the ALJ intended that Plaintiff be able to alternate sitting and standing at his discretion. Simply put, the "very general and vague" nature of the "sit/stand" limitation is more consistent with a "discretionary" sit/stand option in which Plaintiff is permitted to sit and stand at will, than with a rigidly defined and imposed sit/stand option in which Plaintiff is only permitted to sit or stand a certain number of times, or at predetemined intervals of specific duration. *See cf. Davi v. Heckler*, 1984 WL 62778, at *4 (E.D.N.Y. 1984)

(holding "vague" social security statute requiring the suspension of disability benefits to a convicted felon confined to a penal institution who fails to participate in approved rehabilitation programs, and setting forth non-specific standards for such prison rehabilitation programs, while vesting discretion with the courts and the Commissioner to establish and supervise such programs was "quite consistent with [the statute's] direction that rehabilitation programs be specifically approved for each individual participant.").

Plaintiff's argument that the ALJ failed to include in his hypothetical a sufficiently specific sit/option is therefore without merit.

### 3.     VA's Disability Determination

Plaintiff argues the ALJ erred by failing to properly evaluate the disability determinations made by the VA, which are entitled to "some weight."  Plaintiff's Memorandum at 13-15; Plaintiff's Reply at 3-5; 8-9.  Defendant has not directly addressed this argument.

The record establishes that the ALJ did comment on the fact that Plaintiff's non-service connected disability had been increased to 70% based on Plaintiff's anxiety disorder, not otherwise specified, but found no objective evidence in the record supporting Plaintiff's subjective claims.  (R. 18 and 26 (citing R. 660)).  Accordingly, there is no merit to Plaintiffs' assertion, Plaintiff's Memorandum at 14,  that the ALJ "completely disregarded" the VA's decisions.

The VA's most recent determination was that Plaintiff had a 70% disability. (R. 660). A disability decision by any other governmental agency, however, is not binding on the Commissioner because such decision is based on the other agency's rules, rather than on social security law. 20 C.F.R. § 404.1504. Furthermore, a finding by a physician that Plaintiff has a partial disability is not inconsistent with the ALJ's determination that Plaintiff is not disabled. *Lohnas v. Astrue*, 2011 WL 1260109, at * 5 (W.D.N.Y. Mar. 31, 2011) (citing *Verginio v. Apfel*, 1998 WL 743706, at *7-8 (N.D.N.Y. Oct. 23, 1998) (denying disability benefits despite plaintiff's physician's opinions that the plaintiff was partially disabled)). As such, the ALJ did not err in failing to consider Plaintiff's partial VA disability determination.

### 4.       Treating Source Opinions

Plaintiff argues the ALJ erred by failing to evaluate and weight the opinion of consulting psychologist Dr. Ryan as required under 20 C.F.R. § 404.1527(d). Plaintiff's Memorandum at 16-17. Defendant maintains the ALJ properly considered the opinions of all medical sources, including two VA Disability Determinations, but the ALJ was not bound by such determinations and entitled to give them less weight even though the opinions came from treating sources. Defendant's Response at 4-6. In further support of his motion, Plaintiff asserts the ALJ's hypothetical posed to the VE at the hearing misrepresented the limitations Dr. Ryan assessed as "moderate to significant." Plaintiff's Reply at 6-7. The record also establishes that the weight the ALJ afforded to the opinion of Dr. Ryan, Plaintiff's treating psychiatrist at the VA, was not erroneous.

As relevant, 20 C.F.R. § 404.1527(d)(2) provides that

> [g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. . . .

20 C.F.R. § 404.1527(d)(2).

*Accord*, *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d. Cir 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). The SSA regulations specify the following factors as relevant "in determining the weight to give the [treating physician's] opinion": (1) the length of treatment, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) support afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole, and (6) the specialization of the treating physician.  20 C.F.R. §404.1527(d).  Furthermore, if the ALJ does not afford the treating physician's opinion controlling weight, he is required to adequately explain the weight he did give to the opinion.  *Id.*

Here, on December 1, 2008, Dr. Ryan's assessment of Plaintiff included that

> He demonstrates no significant limitations in his ability to follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, and learn new tasks.  *He may have moderate to significant limitations in ability to perform complex tasks, make adequate decisions, relate with others, and deal with stress*.

(R. 246) (italics added).

The ALJ's hypothetical posed to the VE at the hearing specifically included Dr. Ryan's equivocal assessment that Plaintiff has "a moderate to a significant limitation on making adequate decisions and dealing with stress," further defining such limitation as "more than 50 percent of the time." (R. 65). Further, the jobs the VE had already identified did not require performing complex tasks or more than occasional interaction with others. (R. 62). As such, there is no merit to Plaintiff's assertion, Plaintiff's Reply at 6, that the ALJ's hypothetical improperly represented Plaintiff's limitations to the VE. Further, although the ALJ, in his decision, characterized such limitations only as "moderate," (R. 23), is consistent with Dr. Ryan's equivocation that Plaintiff's limitations "may . . . [be] moderate to severe." (R. 246).

Significantly, consultant psychologist Dr. Totin's findings made on January 16, 2009, six weeks after Dr. Ryan's December 1, 2008 assessment, were similar to those of treating psychologist Dr. Ryan, including that Plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers and peers without distracting them or exhibiting behavior extremes. (R. 254-55). As such, even if the ALJ did grant more weight to Dr. Totin's opinion than that of Dr. Ryan, no error occurred.

## CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 9) should be GRANTED, and Plaintiff's motion (Doc. No. 11) should be DENIED.  The Clerk of the Court should be directed to close the file.


Respectfully submitted,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     September 23, 2013
             Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     September 23, 2013
           Buffalo, New York